

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00524-CV

**IN THE INTEREST OF M.R.D.**, J.A.D., and A.M.A.

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-02024
Honorable Charles E. Montemayor, Associate Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Irene Rios, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: February 19, 2020

AFFIRMED

This is an appeal from an order terminating parental rights. Three of the four parents whose rights were terminated have appealed the trial court's order. Appellant Mother Amber A.[1] appeals the termination of her parental rights to her three children: thirteen-year-old M.R.D., six-year-old J.A.D., and two-year-old A.M.A. She brings three issues on appeal: (1) the evidence is legally and factually insufficient to terminate her parental rights to her children pursuant to subsections (D) and (E) of section 161.001(b)(1) of the Texas Family Code; (2) the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in her children's best interest; and (3) the trial court abused its discretion in appointing the Department

---

[1] To protect the identity of the minor children, we refer to the parties by fictious names, initials, or aliases. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

of Family and Protective Services as managing conservator of the children. Appellant Father John M. argues on appeal that the evidence is legally and factually insufficient to terminate his parental rights to his daughter A.M.A. pursuant to subsections (D), (E), (N), and (O). Finally, Appellant Father Joshoa D., father of J.A.D., brings one issue on appeal: whether the evidence is legally and factually insufficient to support the trial court's best-interest finding. We affirm.

### STANDARDS OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings by the trial court, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factually sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the trial court is the sole judge of the weight and credibility of the evidence. *Id*.

We review a trial court's conservatorship decision under a less stringent standard than the one used to review a termination decision. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Conservatorship decisions are subject to review only for an abuse of discretion, and reversal is proper only if the decision is arbitrary and unreasonable. *Id*.

**APPELLANT MOTHER AMBER A.**

The trial court terminated Amber A.'s parental rights based on subsections (D), (E), (O), and (P). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P). The trial court also found that termination of Amber A.'s parental rights was in her children's best interest. *See id*. § 161.001(b)(2). On appeal, Amber A. argues the evidence is legally and factually insufficient to support the trial court's findings under subsections (D) and (E). Amber A. also argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. Finally, Amber A. argues the trial court abused its discretion in making its conservatorship finding.

### A. Subsections (D) and (E)

We note that Amber A. has not challenged the sufficiency of the evidence of all the predicate grounds found by the trial court. Generally, "if multiple predicate grounds are found by the trial court, we will affirm based on any one ground, assuming a proper best-interest finding." *In re A.R.R.*, No. 04-18-00578-CV, 2018 WL 6517148, at *1 (Tex. App.—San Antonio 2018, pet. denied) (mem. op.). However, because termination pursuant to subsections (D) or (E) may implicate future parental rights proceedings, we must address issues raised on appeal challenging a trial court's findings under subsections (D) or (E). *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

### 1. Endangerment

Subsection (D) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under subsection (D), the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Conduct of a parent in the home can create an

environment that endangers the physical and emotional well-being of a child." *Id*. "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id*. "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id*. "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (mem. op.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). "[A] parent need not know for certain that the child is in an endangering environment, awareness of such a potential is sufficient." *Id*. (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)).

Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections, "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id*. at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "However, there are some distinctions in the application of subsections (D) and (E)." *Id*. (citation omitted). Termination under subsection (D) may be based upon a single act or omission. *Id*. at *3 (citing *In re R.S.-T.*, 522 S.W.3d at 109). In contrast, termination under subsection (E) "may not rest on a single act or omission; it must be 'a voluntary, deliberate, and conscious course of conduct.'" *Id*. (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—

Houston [1st Dist.] 2010, pet. denied)). Additionally, in evaluating endangerment under subsection (D), "we consider the child's environment *before* the Department obtained custody of the child.'" *Id*. (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet denied)) (emphasis added). Under subsection (E), however, "courts may consider conduct *both before and after* the Department removed the child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

"An endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at * 5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. (citation omitted). "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id*. "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id*.; *see In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (holding evidence sufficient to support finding of endangerment even though father had made significant recent improvements because "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

### *2. Evidence at Trial*

In arguing that the evidence is legally and factually sufficient to support the trial court's findings under both subsections (D) and (E), the Department emphasizes that Amber A. has had five CPS referrals and that she has engaged in conduct that has endangered the physical and emotional well-being of her children by using illegal drugs, repeatedly engaging in or placing herself in situations of domestic violence, and failing to provide stability for her children. The Department points to evidence of her moving multiple times because of this pattern of domestic violence and thus uprooting her children frequently.

Melinda Rangel, the family-based worker for the Department, testified at trial that she was assigned to a 2016 family-based case for domestic violence involving Amber A. and John M. John M. is the father of A.M.A., who was not born until May 2017. According to Rangel, "[t]here was an incident [in October 2016] where [Amber A.] and [John M.] were in an altercation," and John M. threw a remote control that hit J.A.D., who was three years-old at the time, in the face. John M. "was validated for UT—unable to determine." Amber A., however, "was ruled out based on the fact that it was her first case." Rangel testified that Amber A. agreed to participate in services and not allow John M. access to her children (who were at that time M.R.D. and J.A.D.). Rangel testified that the Department had concerns with Amber A. abusing prescription drugs. Amber A. completed services, including individual counseling, domestic violence classes, and a substance abuse program. She also agreed to enroll M.R.D. in a Big Brother program. During the family-based case, Rangel testified she received "intakes" in September 2017 that Amber A. was not following the safety plan and that she and her children had been seen with John M. According to Rangel, different family members called and told Rangel they had seen Amber A. with John M. "out in the city, restaurants, sometimes with the children, sometimes without the children." When Rangel asked Amber A. about these sightings, Amber A. denied she had been in John M.'s

company. Rangel testified she then went to the daycare to ask the children about what had been happening. At the time, J.A.D. was four years-old; he told Rangel that John M. had been staying at the home, that John M. and Amber A. argued a lot, and that "he was fearful." Rangel asked the daycare to allow her to see "the demographic card," and it showed that Amber A. had added John M. to the list of people who could pick up the children. Rangel testified that even though Amber A. had already completed domestic violence services at this point, it appeared she was still allowing John M. to be around her children. Rangel testified that the family-based case was closed in March 2018. According to Rangel, she had concerns about placing the children back in Amber A.'s care, but Rangel "wasn't able to prove that [Amber A.] was not allowing people [who] were—individuals [who] were not safe around the children." Rangel testified that because Amber A. "was initiating contact," "maintained contact with the family," including "the aunt and the uncle" who were caring for the children, and completed her services, Rangel "had to give [the children] back" in March 2018.

Rangel testified that during the family-based case, Amber A. said "multiple times" that she was going to file a protective order and was not going to allow John M. in her home. She told Rangel that "she was fearful of him" and that "he would bang on her door in the middle of the night." Amber A. would not, however, "follow through with pursuing charges." Rangel testified, "I think that she continued that relationship until I was able to prove that—when I removed the children, and then he was incarcerated, so it ended." Rangel noted that Amber A. had always denied allowing John M. around her children and that M.R.D. had also denied it initially. But, then "later on when he was with aunt and uncle, he made outcries that [John M. had been] around." M.R.D. stated that "he was fearful to go back home." M.R.D. said that his mom would do whatever she needed to do so that her children would be returned to her, but that "eventually" she would "go back to her old ways." M.R.D. told Rangel he was fearful of domestic violence and that his mom

would again "bring men around." Rangel testified that she was impressed with Amber A.'s "effort in getting her services completed," noting that Amber A. "was compliant and cooperative"; however, Rangel remained concerned that Amber A. was not protective of her children and had not learned anything from her domestic violence classes.

Six months after the family-based case was closed, on August 29, 2018, the Department received a referral regarding Amber A. being involved in a violent relationship with her boyfriend. Asheme Lee, an investigator with the Department, testified she spoke with M.R.D., who was twelve years-old at the time. M.R.D. stated that his mom's boyfriend, Antonio V., was violent towards her. "The child stated that there were several incidents that occurred at the apartment" where the family was living. M.R.D. reported an incident where Antonio V. "came to the home and he tried to break into the window while [M.R.D.] was in the room with his mom and his siblings." M.R.D. told Lee that even after this incident, his mom continued to see Antonio V. M.R.D. "stated that sometimes he felt that his mom was hiding [Antonio V.] inside the home, because she would come out of the bedroom and . . . kind of close the door quickly." M.R.D. said that "there were times when he would go to school in the morning and he would see [Antonio V.]'s car parked in the parking lot of the apartment complex." M.R.D. "also stated that his mom was smoking marijuana." When asked to describe it, M.R.D. said it looked like "a brown stick" and smelled like a "skunk." Lee asked Amber A. about using marijuana, and she denied using it. According to Lee, a drug test performed on Amber A. was negative.

Lee testified that she also asked M.R.D. about the other fathers in this case. M.R.D. said that Amber A. and John M. "would fight sometimes." Lee testified she then did a "case mapping" where she "looked at all of [Amber A.]'s cases with the Department." Before the case Lee was investigating, Amber A. had had four prior cases with the Department: one in 2015, one in 2016, and two in 2017. Lee testified the children had spent most of 2017-18 living with their uncle. On

September 5, 2018, Lee met with Amber A. about the domestic violence concerns regarding Antonio V. Lee testified they went over Antonio V.'s criminal history and put a parent-child safety plan in place with the uncle. Lee told Amber A. that to be protective of her children, Amber A. could not have any contact with Antonio V. and could not allow him inside her home. Amber A. told Lee she had not had any contact with Antonio V. in the previous two weeks. Later that day, however, Lee called Amber A.'s phone and Antonio V. answered. The Department then removed the children.

Marissa Benavides, a caseworker with the Department, testified that she was assigned this case in September of 2018. At first, she did not know who was A.M.A.'s father because Amber A. did not give any identifying information. Amber A. provided the information after the Chapter 262 hearing. Benavides testified that since September 9, 2018, the children have been placed with their maternal uncle and his wife. Benavides testified that "[t]his placement has been the only stability that these kids have had since their first removal in 2017." Before the 2017 case, the children "were going to [the aunt and uncle's] house every other weekend. They are very bonded to these caregivers." According to Benavides, the aunt and uncle are able to meet all of the children's needs. "The kids are comfortable in the home." "They are well adjusted." "They're happy." "They've stated that they feel safe there." The children are current "on all their medical and dental." "They're involved in the counseling that they need." M.R.D. "is currently in a summer camp that he's enjoying." The aunt and uncle have family outings and attend family parties. "They're very active." Benavides testified the aunt and uncle have "been down this road with mom several times. They don't agree with the decisions that she's made. They've verbalized that both to me and mom. And they feel for the kids. And they're tired of seeing them put through the same thing over and over." According to Benavides, the aunt and uncle have served as stability for the children "pretty much their whole lives." They have put "food in mom's fridge to care for the kids—to feed the

kids." They have acted as "a safety net when mom is relapsing or there's concerns for domestic violence." They are protective of the children. Benavides testified that the aunt and uncle are licensed foster care providers, and the long-term plan for the children is relative adoption.

Benavides testified Amber A. completed domestic violence classes, parenting classes, and drug treatment. She also visited the children throughout the case. She engaged in counseling but was not successfully discharged. Benavides noted that this was not the first time Benavides had completed these services. According to Benavides, Amber A. had a pattern of completing her services and then falling back into her old habits. Benavides testified that there had been a recent incident on May 21, 2019 with Amber A. and Antonio V., resulting in Antonio V. being arrested for drug possession and violation of a protective order. On May 30, 2019, Benavides met with Amber A.; however, Amber A. made no mention of this incident. A week later, Benavides was notified of the incident; she called Amber A. and asked Amber A. if she needed to tell Benavides anything. Amber A. replied, "No." Benavides testified that since the time she addressed the incident with Amber A., Amber A. has told her "about four or five different stories." According to Benavides, one of her biggest concerns was how Antonio V. had gotten inside the apartment Amber A. shared with her mother. Benavides noted that every story told by Amber A. began with Antonio V. "throwing rocks at her window."

> The first story was that she let him in, because she was fearful that he would break the window. But that she had to calm him down. And then she let him fall asleep on the couch. And that's when she proceeded to call the police. The second story was that he had a key to the apartment. So now she didn't let him in. He had a key. She doesn't know how he got the key. The key was on his key ring. She didn't know how he got the key. The [third] story was that he found a key—there's a spare key under the trash can and let himself in.

Benavides noted that the story about Antonio V. "having the key on his key ring" is consistent with the police report, but when Benavides asked Amber A. about how Antonio V. got the key,

she claimed to have no idea. Benavides noted that Amber A. claimed to have been worried about Antonio V. breaking the window by throwing rocks. Benavides told Amber A. that whether he broke the window should not have been her concern and her first response should have been to call the police. It should not have been "opening the door for him, letting him in, letting him fall asleep in her apartment, and then proceeding to call the police." Benavides was concerned that neither Amber A., nor her mother who was also present, immediately called the police. Benavides was also concerned about the illegal drugs found on Antonio V. Benavides explained that at the beginning of this case, Amber A. had "tested positive for methamphetamines and marijuana." According to Benavides, Amber A. had admitted to illegal drug use. However, no other drug tests taken by Amber A. during the case were positive.

Benavides testified that Amber A. had engaged in conduct that endangered the physical and emotional well-being of her children because of the "drug use, the repeated domestic violence, [and] the instability" of moving again after "a domestic violence incident." Benavides noted that Amber A. was in the process of moving again because of the most recent incident; she had moved the previous Friday and had provided Benavides with the new address. Benavides had not been able over the weekend to visit Amber A.'s new residence. Benavides noted that she had had trouble with visiting Amber A.'s home in the past: "Every time I've gone unannounced, I'm not able to get in. [Amber A.] doesn't open the door even though her car is parked outside. The only time I'm ever able to go into the home is when it's scheduled and planned."

Benavides testified that Amber A.'s visits with her children have gone well. However, M.R.D. has told Benavides that he does not want any extended visitation with his mom and is happy with only one-hour visits. "He feels that his mom is just putting on a show during visits, because people are watching. He says that the activities that they do during visits are nothing that they would regularly do—nothing that they ever did while actually placed with mom." Benavides

testified that Amber A. cannot meet the physical and emotional needs of her children, because she has not "fully grasped how her decisions have impacted them." Amber A. has a "pattern of domestic violence." Benavides testified,

> As we've seen, she works all the services, and then falls back into her same patterns. The oldest [M.R.D.] knew that another incident would occur sooner, earlier. Throughout this whole case, [M.R.D.] stated that he knows that mom is going to—He has stated specifically mom is either going to go back to Tony, which is Antonio V[.], or John [M.].

Benavides testified that Amber A. "has not demonstrated an ability to change the behavior that led to the removal, and she has not demonstrated an ability to be honest with me." Benavides testified that even though Amber A. had engaged in all her services, she had not met her goals.

Patricia Boone, Amber A.'s therapist, testified she had seen Amber A. from January 23, 2019 to June 26, 2019. She testified that Amber A. has "an issue with domestic violence" that they were in the process of working through. Boone believed Amber A. had the ability to change her past behaviors. However, because Amber A. had not been in therapy very long and because of her "long pattern and history of domestic violence," Boone testified that she did not believe "that streak is broken with" Amber A. and that she needed more therapy. Boone explained that before the May 21st incident with Antonio V., Amber A. had told Boone "she was done with [him]." After the incident, Amber A. had an appointment with Boone, but did not mention the incident with Antonio V. even though they discussed "topics that would have led her to mention that [incident]." Boone testified she was concerned Amber A. did not mention the incident at this time because Boone believed that Amber A. had made a breakthrough at the beginning of May in her therapy. Boone had believed that Amber A. had finally understood "her addiction to men and the addiction to the drug, and the purpose of the men and their behavior—[and how the] violence toward her overrode everything, because of her addiction to the drug [and how] the men provided

the drug to her." It was not until a month later that Amber A. told Boone about the May 21st incident. Amber A. said that "she was asleep, and she heard somebody throwing rocks at her window."

> [B]efore she could even get up and get to the door, Antonio [V.] was already in her bedroom demanding to see her phone. And she was trying to calm him down, because she didn't know if he was going to be violent or what he was going to do. So her brain just went to getting him to calm down. And when she got him to calm down, he took off all his clothes and climbed into her bed, and that's when she called the police.

According to Boone, Amber A. could not provide a safe and stable home for her children because she had not yet "processed and finished working through her domestic violence, her history of domestic violence, and why she seeks out violent men." Boone testified that Amber A. told her about many of Amber A.'s previous relationships that involved domestic violence, including her relationships with Joshoa D. and John M. While Boone did not believe Amber A. would hurt the children, she believed "her choices in men would hurt her kids." In Boone's opinion, based on Amber A.'s past behavior, Amber A. will continue to choose violent men.

Andrea Tristan, a licensed professional counselor with the Celebrating Families program at Family Violence Prevention Services, testified that Celebrating Families is a sixteen-week educational program for CPS-referred families and is designed to improve overall family dynamics and strengthen family relationships between parents and children. Tristan testified she had worked with Amber A. since April 24, 2019. According to Tristan, Amber A. has been "highly engaged and has been consistent in her attendance." With regard to the May 21 incident, Tristan testified Amber A. told her that Antonio V. had "appeared at her home and they engaged in a verbal altercation that escalated to the point that she had to contact police and then press charges." Amber A. told her that Antonio V. "found a key that—or a spare key that her and her mother shared." Amber A. did not tell Tristan what they had been fighting about or that Antonio V. had drugs on

him. Tristan testified that Amber A. was not ready to have her children back but believed that Amber A. should be given more time to work services and work toward reunification with her children. However, when questioned about her knowledge of Amber's past relationships, Tristan admitted that she was not aware that despite completing domestic violence programs in the past, Amber A. had become involved in relationships with domestic violence.

Amber A. testified that she had moved in with her mother and worked as a hair stylist. She completed domestic violence classes, two parenting classes, and one-on-one counseling. She claimed to have learned about her pattern of becoming involved in relationships with domestic violence. She testified that in August 2018, she ended her relationship with Antonio V. and had not reconciled with him. She stated that on May 21, 2019 at 3:30 a.m., she was sleeping when she woke to rocks being thrown at her upstairs bedroom window:

> Before you know it, like shortly after, [Antonio V.] was in my bedroom trying to argue with me. I tried to calm down. I didn't want to upset him any further, because he seemed like he was kind of drunk—you know, belligerent. And he calmed down. He got into the bed. Once he fell asleep, shortly after, I grabbed—I looked down at his clothes, because he took everything off, and my key to the apartment was on his person. So I grabbed that, grabbed my phone, went downstairs, woke my mother up. And we called the cops. And we opened the door. The cops arrived. They went upstairs to arrest him. And we heard like a little bit of scuffling, or whatnot, and he was screaming my name. And so that happened. The cops were there by about 4:37, so he was only there for a few minutes, like an hour.

Amber A. testified that because her mother had lost her key, they had been sharing a key by placing it underneath a trashcan by the front door. According to Amber A., she did not tell her caseworker about the incident because she "kind of went into a panic." She admitted that it was a mistake not to have told her. On cross-examination, Amber A. was questioned about how Antonio V. got inside her home. She replied that she did not know how he got inside but admitted her key was on a key ring in his possession. She was then asked whether she remembered telling her caseworker that

she had opened the door for him because she was afraid the rocks were going to break the window. She replied, "I don't remember saying that."

Amber A. testified she was a good mother and has a bond with her children. However, she admitted that the children had been "through a lot" and that "[i]t's not their fault [her] decisions and [her] active addiction have affected them this way." When asked whether it was true that M.R.D. tells everybody about "all the domestic violence he's witnessed" and that it was her fault "because of all the men that [she] continually br[ought] into the home," Amber A. replied, "I believe that's correct." She was then asked whether it would surprise her to know that M.R.D. believes she is "putting on a show for everyone," Amber A. replied that it did not surprise her but attributed his feelings to not having had alone time with her. Regarding the children's current placement, she agreed they were in a "safe place" with her brother.

### 3. Analysis

In reviewing the legal and factual sufficiency of the evidence to support the trial court's findings under subsections (D) and (E), we emphasize that the trial court is the sole judge of the weight and credibility of the evidence. *In re J.O.A.*, 283 S.W.3d at 344. The trial court in this case could reasonably believe the witnesses who testified that Amber A. had changed her story about the May 21 incident multiple times and disbelieve Amber A.'s version of the incident. Further, there was evidence of Amber's past violent relationships, including one instance where one of the children was injured by a thrown remote control. There was also evidence about the numerous CPS cases that had been filed against Amber A. Additionally, witnesses testified about what M.R.D. said about his mother's pattern of being in relationships involving domestic violence and how those relationships affected him. Thus, even though the evidence showed Amber A. had successfully completed her services and had visited her children regularly, the trial court could reasonably conclude from the evidence in this case that (1) even after successfully completing

domestic violence services, Amber A. would continue her pattern of becoming involved in relationships of domestic violence, and (2) her children would be endangered by this behavior. Therefore, we conclude the evidence is legally and factually sufficient to support the trial court's finding under subsection (D). *See In re J.T.G.*, 121 S.W.3d at 125 (explaining that abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child); *see also In re C.J.G.*, 2019 WL 5580253, at *2 (stating that a "child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards"). Similarly, the evidence of Amber A.'s pattern of engaging in domestic violence relationships and not being protective of her children, thus subjecting them to uncertainty and instability, is legally and factually sufficient to support the trial court's finding under subsection (E). *See In re K.J.G.*, 2019 WL 3937278, at *5 ("Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

### B. Best-Interest Finding

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307(b).[2] In addition to these statutory factors, in considering the best interest of the child, a

---

[2] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate

court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a court may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

As noted, in this case, there was evidence that Amber A. had a pattern of being in relationships involving domestic violence; that this pattern negatively impacted her children and created instability in their lives; and that Amber A. had not yet broken this pattern and had not learned to be protective of her children. There was also evidence that the children were thriving in their current placement with their maternal uncle and aunt; that even before this case, their maternal uncle and aunt had provided the only stability these children had known; and the long-term plan was adoption by the maternal aunt and uncle. We therefore conclude that the evidence is both legally and factually sufficient to support the trial court's best interest finding. *See In re J.O.A.*, 283 S.W.3d at 344-45.

---

agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[3] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

### C. Conservatorship Finding

Finally, Amber A. argues that because the trial court's termination order is not supported by sufficient evidence, then the trial court necessarily abused its discretion in making its conservatorship finding. However, we have determined that because the trial court's findings were supported by legally and factually sufficient evidence, the trial court did not err in terminating Amber A.'s parental rights. Thus, Amber A.'s argument has no merit. *See In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at * 6 (Tex. App.—San Antonio 2017, pet. denied) (mem. op.) (explaining that when an appellate court determines no error on the part of the trial court in terminating appellant's parental rights, appellant no longer has any legal rights with respect to her children and cannot challenge the portion of the termination order that relates to the appointment of conservators).

### APPELLANT FATHER JOHN M.

On appeal, Appellant Father John M. argues the evidence is legally and factually insufficient to support the trial court's findings pursuant to subsections (D), (E), (N), and (O).

### A. Subsections (D) and (E)

Like Amber A., John M. argues the evidence is legally and factually insufficient to support trial court's endangerment finding under subsections (D) and (E). He points out that his daughter, A.M.A., came into state care because of allegations of domestic violence between Amber A. and her boyfriend, Antonio V. John M. emphasizes that he was incarcerated when the May 21 incident between Amber A. and Antonio V. occurred. Further, he argues there was no evidence presented at trial that he knew domestic violence was taking place in Amber A.'s relationship with Antonio V. In response, the Department points to evidence that John M. has a history of domestic violence with Amber A., along with a criminal history. *See In re K.J.G.*, 2019 WL 3937278, at * 5 ("A

parent's commission of criminal conduct, whether illegal drug use or commission of another crime, may constitute endangering conduct under subsection (E) due to the risk of incarceration.").

As noted above, there was evidence presented at trial of the 2016 family-based case, including testimony that (1) John M. had thrown a remote control that hit J.A.D. in the face; (2) J.A.D. said that Amber A. and John M. argued a lot and that "he was fearful"; and (3) M.R.D. said that Amber A. and John M. "would fight sometimes" and that "he was fearful to go back home." In addition to the testimony discussed above, Tristan (Amber A.'s counselor) testified Amber A. had discussed the domestic violence that had occurred during her relationship with John M. Further, Benavides (the caseworker) testified that John M. was in custody for drug possession and his maximum release date was November 24, 2020. According to Benavides, John M. does not have a relationship with two-year-old A.M.A. because he has been incarcerated and has not seen her since she was three months-old.

John M. testified that until the time of his incarceration, he did have a relationship with A.M.A. He testified that he was serving a three-year prison sentence for possession of drugs. According to John M., on April 17, 2016, he was living with Amber A. in an apartment when "her roommate called the police because she wanted me out." The police then found illegal drugs in the apartment and arrested John M. for possession of an illegal substance. He was given deferred adjudication and placed on community supervision. One condition of his community supervision was that he would have no contact with Amber A. According to John M., he violated that condition because Amber A. was pregnant with A.M.A. Thus, on January 10, 2018, the trial court adjudicated his guilt and sentenced him to three years of imprisonment. On cross-examination, John M. was asked whether he had "experienced domestic violence" with Amber A. John M. replied, "Yes." When asked whether it was true Amber A. had procured two protective orders against him since 2016, John M. replied, "Yes." He was then asked whether he was aware that there was a pending

case for violation of a protective order relating to Amber A. He answered, "Yes." Regarding the testimony about him hitting J.A.D. with the remote, John M. stated it had been M.R.D., not J.A.D., who had been hit by the remote. According to John M., "I just handed it back and [M.R.D.] happened to stand behind me and it just up and hit him." Regarding Amber A., John M. testified that Amber A. "was without a father for many years" and had "trust issues" and "relationship problems." He stated that she "lies constantly" and "has an addiction."

We again reiterate that the trial court is the sole judge of the weight and credibility of the evidence. *In re J.O.A.*, 283 S.W.3d at 344. In this case, there was evidence from which the trial court could have reasonably concluded that John M. had committed domestic violence during his relationship with Amber A., that he had injured a child during one of these episodes, that he had violated a protective order relating to Amber A., and that he illegally used and possessed drugs while in a relationship with Amber A., resulting in his incarceration. John M. argues that the evidence is insufficient because we should consider the time period immediately preceding the children's removal and during that time period, he was incarcerated. Thus, he argues there is no evidence to support endangerment. While we agree that "termination may not be based solely on conditions that existed in the distant past but no longer exist, the dispositive inquiry is whether the past continues to bear on the present." *In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). The evidence in this case established a pattern of domestic violence between Amber A. and John M. that continued until his incarceration in 2018. Further, John M.'s illegal drug use and violation of a protective order relating to Amber A. is directly related to his current incarceration. His conduct was thus not in the distant past but was part of a course of conduct that eventually contributed to the children's removal. Additionally, the evidence showed that John M. will soon be released from prison as his maximum sentence date is August 19, 2020. From this evidence the trial court could have reasonably concluded that John M. had engaged in

conduct that endangered the physical or emotional well-being of the child under subsection (E). We therefore hold the evidence is legally and factually sufficient to support the trial court's finding under subsection (E). *See In re J.T.G.*, 121 S.W.3d at 125.

Further, under subsection (D), there is legally and factually sufficient evidence from which the trial court could have reasonably concluded John M. had knowingly placed or allowed A.M.A. to remain in conditions or surroundings which endangered her physical or emotional well-being. In addition to his acknowledgement of Amber A.'s drug addition, there is evidence from which the trial court could have reasonably concluded that even after John M. was incarcerated, he was aware of Amber A.'s pattern of domestic violence and her preference for "violent" men. *See In re S.Z.*, No. 04-18-00095-CV, 2018 WL 3129442, at *5-6 (Tex. App.—San Antonio 2018, pet. denied) (mem. op.).[4]

### APPELLANT FATHER JOSHOA D.

Finally, Joshoa D. brings one issue on appeal: whether the evidence was legally and factually sufficient to support the trial court's best-interest finding.

In addition to the evidence discussed previously, Rangel (the family-based caseworker) testified that after the October 2016 incident where John M. threw a remote control, Rangel met with J.A.D.'s father, Joshoa D. Rangel testified that Joshoa D. was not involved in J.A.D.'s life, but claimed he wished to be. However, he would not engage in any services and refused to drug test. According to Rangel, Joshoa D. admitted he used illegal drugs.

Benavides (the caseworker) testified that Joshoa D. had maintained contact with J.A.D. except for the period of time he was incarcerated (November 2018 to April 2019). Joshoa D. had

---

[4] Having found sufficient evidence to support the trial court's findings under subsections (D) and (E), we need not reach John M.'s remaining issues related to subsections (N) and (O). *See In re A.R.R.*, 2018 WL 6517148, at *1 (explaining that appellate court can affirm on any one predicate ground, assuming a best-interest finding).

been on community supervision for a drug offense but was then incarcerated for "[f]ailing a drug test for his probation." According to Benavides, Joshoa D. did not complete his service plan. The top three services he needed to address were visitation with J.A.D. to maintain a bond; obtain stable housing and employment; and complete clean drug tests. As noted, before his incarceration, he failed a drug test. Benavides testified that after Joshoa D.'s release in April 2019 to the date of trial on July 8, 2019, he did not test positive for illegal substances. According to Benavides, Joshoa D. contacted her upon his release, stating that he wanted to engage in services but then "did not set up his services until the day of our last court hearing on June 10[, 2019]." Benavides testified that Joshoa D. had "never cared for [J.A.D.] in the past."

Further, Benavides noted that every time Amber A. had a CPS case in the past, Joshoa D. had been notified but had never intervened or attempted to take possession of J.A.D. "so that [J.A.D. was] no longer exposed to the domestic violence and drug use." Benavides testified Joshoa D. was not protective toward J.A.D. During his testimony, Joshoa D. admitted he had been aware that Amber A. had had multiple domestic violence relationships, but he believed "people can change." Joshoa D. also admitted that he was aware that before Amber A. was involved with Antonio V., she had been living with John M. When asked if he had been aware there was domestic violence in that relationship, Joshoa D. replied, "Yes, ma'am." When asked why he had left J.A.D. in Amber A.'s care, Joshoa D. claimed that he tried to have J.A.D. live with him, but that Amber A. would not allow it.

Joshoa D. testified he had been employed for a month-and-a-half and that child support was being deducted from his paycheck. He testified that when this case was filed, he had been on probation stemming from an incident "a few years back" where he had been "trying to secure the safety of [his] son." Joshoa D. admitted that his charge was for burglary and that he had been placed on deferred adjudication community supervision for four years. When asked on cross-

examination to tell the court more about this burglary charge, Joshoa D. refused and invoked his rights under the Fifth Amendment.

Q:    You said you were protecting your son, right?

A:    Yes, sir—I mean, yes ma'am. Sorry.

Q:    Did you break into Amber [A.]'s house?

A:    No, I didn't.

Q:    Okay. Where was he?

A:    I'm pleading the Fifth.

Q:    Okay. You're aware that you've already served your time on that case, right?

A:    I believe I'm on probation currently for that case.

Q:    How much longer are you on probation?

A:    Ten months.

* * * * *

Q:    In fact, you're on probation for burglary of a habitation with the intent to commit assault; isn't that correct?

A:    That is what it is titled, yes.

Q:    And the victim of that case is Amber A[.], is that right?

A:    Yes, ma'am.

Q:    Okay. And there is prior domestic violence in your relationship, right?

A:    Not really, no.

Joshoa D. also testified that he did not have a problem with illegal drugs. Contrary to Benavides's testimony that he had refused two hair follicle tests in September 2018 and October 2018, Joshoa D. claimed that he had never refused a drug test. When it was pointed out his

probation had been revoked for a failed drug test, Joshoa D. stated that he "failed" the test because of a "diluted urine sample." He testified he was not using illegal drugs at the time and the diluted test was not a result of him attempting to circumvent the test.

When asked why his parental rights should not be terminated, Joshoa D. testified,

> Because I am his father. There's no other better person in the world to raise him. I love him. And he needs his father. He needs me in his life. . . . I mean, the lack of me, you know, not being there would [be] detrimental, I believe, to him and to myself. And I don't think that it's in the best interest at all financially, emotionally, spiritually.

In reviewing the record, there is evidence that Joshoa D. has had problems with illegal drug use, has not been involved in J.A.D.'s life, has not taken steps in the past to protect J.A.D. even though he had been aware of Amber A.'s abusive relationships, and was incarcerated as a result of a charge relating to his actions against Amber A. As noted previously, there was also evidence the children in this case were thriving in their current placement with their maternal uncle and aunt, who had, even before this case, provided the only stability these children have known and who planned to adopt the children. We therefore conclude that the evidence is both legally and factually sufficient to support the trial court's best interest finding. *See In re J.O.A.*, 283 S.W.3d at 344-45.

## CONCLUSION

Having concluded the evidence is legally and factually sufficient to support the trial court's findings challenged on appeal, we affirm the order of the trial court terminating parental rights.

Liza A. Rodriguez, Justice